1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7        SHANE SHANNON,                            Case No. 20-cv-04281-EMC

8                      Plaintiff,

9              v.                                  **ORDER GRANTING DEFENDANT'S
                                                   MOTION FOR SUMMARY
10       PETER BUTTIGIEG,                          JUDGMENT**

11                     Defendant.                  Docket No. 78

12

13

14            Plaintiff Shane Shannon is an air traffic controller who works at Napa Tower.  He has sued

15     the federal government for employment discrimination – specifically, for disparate treatment in

16     violation of the Age Discrimination in Employment Act ("ADEA").[1]  Having considered the

17     parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court

18     hereby **GRANTS** the government's motion for summary judgment.

19                    **I.        FACTUAL & PROCEDURAL BACKGROUND**

20            During the relevant period, Mr. Shannon was an air traffic controller ("ATC") at Napa

21     Tower.  On two different occasions, he was not selected for an ATC opening(s) at Oakland Tower

22     (which, in effect, would have been a promotion since the position at Oakland Tower apparently

23     commanded higher pay).  The selecting official in both instances was Ms. Lozito, an air traffic

24     manager at Oakland Tower.

25

26

27     _____

       [1] Previously, Mr. Shannon also asserted retaliation claims.  However, in his opposition to the
28     motion for summary judgment, Mr. Shannon now states he is no longer pursuing his retaliation
       claims.

United States District Court
Northern District of California

1   A.       Air Traffic Control Facilities and ATC Certification

2          There are at least two different kinds of air traffic control facilities: tower facilities (such as

3   Napa Tower, Oakland Tower, and San Francisco Tower) and in-route facilities.  The two kinds of

4   facilities differ.  Tower facilities are located at airports.  *See* Supp. Bernardoni Decl., Ex. 27

5   (Lozito Depo. at 84).  In contrast, in-route facilities cover (as indicated by their name) air traffic

6   that is in route.

7          For both tower facilities and in-route facilities, ATCs need to be certified to do tasks.

8   Certifications at the two facilities, however, are not the same – which is not surprising given the

9   differences between the facilities.  *See* Bennett Decl., Ex. A (Shannon Depo. at 21).  For example,

10  in-route facilities do not require certification for flight data, clearance delivery, ground control,

11  and local control.  *See* Bernardoni Decl., Ex. 1 (Shannon Depo. at 28-29).  Such certifications are

12  required for tower facilities as they are located at airports.

13         While a person is the process of certifying, he or she is called a developmental.  Once a

14  person is certified for all positions at a facility, he or she is considered a Certified Professional

15  Controller ("CPC") for that particular facility.  *See* Bennett Decl., Ex. A (Shannon Depo. at 37).

16         Although tower facilities and in-route facilities are different, the FAA rates both kinds of

17  facilities between Level 4 and Level 12.  *See* Bernardoni Decl., Ex. 1 (Shannon Depo. at 31-32).

18  A facility's rating is based on factors such as traffic volume, type of traffic, and complexity of the

19  facility.  The facility's rating impacts an ATC's pay grade.  *See* Bernardoni Decl., Ex. 1 (Shannon

20  Depo. at 31-32).

21         During the relevant events in 2014 and 2015, Napa Tower was rated Level 4, the lowest-

22  level rating.  However, when Mr. Shannon first started to work at Napa Tower in 2003, it had a

23  higher rating: Level 5.  *See* Bernardoni Decl., Ex. 1 (Shannon Depo. at 34) (adding that "[i]t was

24  close to a Level 6 with our numbers just because it was so busy at that time," but then "Japan

25  Airlines filed bankruptcy" and the Japan Airlines Flight School had to close and move back to

26  Japan, "which caused us after a period to lose traffic count and be lowered to a Level 4").

27         It appears that, during the relevant events, Oakland Tower was a Level 7 facility, "close to

28  a Level 8."  Bernardoni Decl., Ex. 6 (Lozito Aff. at 86).  Today, Oakland Tower is a Level 8.  *See*

United States District Court
Northern District of California

1    Bernardoni Decl., Ex. 1 (Shannon Depo. at 35).

2    B.    Mr. Shannon's Background

3        Mr. Shannon was born in 1969. *See* Bernardoni Decl., Ex. 1 (Shannon Depo. at 16). Thus,

4    during the relevant events in 2014-2015, he was about 45-46 years old.

5        Mr. Shannon obtained a GED in about 1987. He completed some college courses at

6    Solano Community College but did not receive a degree. *See* Bernardoni Decl., Ex. 1 (Shannon

7    Depo. at 16-17). He "was studying toward an engineering degree" but "was just trying to get . . .

8    basic requirements out of the way before focusing on [his] major." Bernardoni Decl., Ex. 1

9    (Shannon Depo. at 17). It appears Mr. Shannon spent two years at Solano Community College.

10   *See* Bennett Decl., Ex. J (FAA rating form filled out by Mr. Shannon). He suggests that he had

11   about a year left before he would get an engineering degree.

12       Prior to working for the FAA, Mr. Shannon served in the military, specifically, the U.S.

13   Navy. *See* Bernardoni Decl., Ex. 7 (resume, indicating time at the Navy from 3/1993 to 9/2000).

14   At the Navy, he served as an ATC. *See* Bennett Decl., Ex. A (Shannon Depo. at 19). A Navy

15   ATC can be shore based or on a ship. ATCs that are shore based follow the same procedures and

16   regulations that FAA-certified ATCs do. *See* Bennett Decl., Ex. A (Shannon Depo. at 19-20). Mr.

17   Shannon worked as both a shore-based and ship-based ATC for the Navy. *See* Bennett Decl., Ex.

18   A (Shannon Depo. at 20). The evidence of record does not include any information as to whether

19   a shore-based ATC performs the same kind of tasks as an ATC at a FAA tower facility. There is

20   also no evidence as to whether Navy facilities are rated by levels and, if so, whether those are

21   comparable to FAA levels. However, based on his experience with the Navy, Mr. Shannon has

22   general knowledge on aviation, aircraft characteristics, pilots, and so forth. *See* Bennett Decl., Ex.

23   A (Shannon Depo. at 39).

24       In 2001, Mr. Shannon began working for the FAA as an ATC. The first facility he worked

25   at was Oakland Center, and he was there for about two-and-a-half years. *See* Bernardoni Decl.,

26   Ex. 1 (Shannon Depo. at 27-28). It appears that Oakland Center was a Level 11 facility during the

27   time that Mr. Shannon worked there. *See* Bennett Decl., Ex. A (Shannon Depo. at 36). But

28   Oakland Center is an in-route facility only, not a tower facility.

1     During his time at Oakland Center, Mr. Shannon became certified at two positions,

2  domestic and oceanic.  *See* Bernardoni Decl., Ex. 1 (Shannon Depo. at 28).  It appears that neither

3  position is relevant to a tower facility.  Mr. Shannon did not receive any other certifications at

4  Oakland Center.  According to Mr. Shannon, this was due to an error in his training:

5              [T]here was a new supervisor that . . . had taken over my training
             and he had failed to give me what we call a monthly skill check.  So
6              there were periods where I did not get monthly skill check[s].  And
             basically they burned up all my time, and so I ended up going to a
7              Training Review Board where I was given the option to either
             receive back all of my time or transfer to another facility.
8

9  Bennett Decl., Ex. A (Shannon Depo. at 30).  Mr. Shannon chose to transfer to a different facility

10  – *i.e.*, Napa Tower.

11     Mr. Shannon transferred to Napa Tower in 2003.  He has been at Napa Tower through the

12  present.  *See* Bernardoni Decl., Ex. 1 (Shannon Depo. at 30).  Mr. Shannon ultimately became

13  certified at all positions required at Napa Tower.  *See* Bernardoni Decl., Ex. 1 (Shannon Depo. at

14  22-23, 26-27).

15  C.     Selections for Oakland Tower by Ms. Lozito

16     An Employee Requested Reassignment ("ERR") is when an "employee request[s] to be

17  considered for a position at a facility when there is an opening."  Bernardoni Decl., Ex. 6 (Lozito

18  Witness Aff. at 73).  A selecting official may request and receive an ERR list when there is an

19  opening.  *See* Bernardoni Decl., Ex. 6 (Lozito Witness Aff. at 73).  Human Resources prepares the

20  ERR list – *i.e.*, determines who is an eligible candidate for the position.  The selecting official then

21  makes a selection from that list of eligible candidates.  *See* Bernardoni Decl., Ex. 6 (Lozito

22  Witness Aff. at 74-75).

23     It appears that, as part of the selection process, a selecting official is given an FAA rating

24  form for each eligible candidate.  *See, e.g.*, Bennett Decl., Ex. P (FAA Form 3330-43-I, Rating of

25  Air Traffic Experience for AT Movement).  The form is filled out by the applicant.  Points are

26  given for, *e.g.*, the level of the facility where the applicant was certified, the level of education

27  achieved by the applicant, and so forth.  There is no indication that a selecting official is required

28  to select the applicant with the highest points or is otherwise encouraged to select that applicant.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1        In the instant case, Ms. Lozito was the selecting official at Oakland Tower.  Ms. Lozito is

2  an air traffic manager.  She has been at Oakland Tower, and in that position, since November

3  2013.  *See* Bernardoni Decl., Ex. 6 (Lozito Witness Aff. at 72).

4        According to Ms. Lozito, she does not have a specific selection process[2] but she "usually

5  look[s] for the candidate with the best and most relatable experience to my facility.  If a candidate

6  is from a similar facility with similar traffic/airspace/radar/equipment then I consider this

7  relatable.  I also consider education, pilot experience, aviation experience and military

8  experience."[3]  Bernardoni Decl., Ex. 6 (Lozito Witness Aff. at 74).

9        Ms. Lozito states that it is "crucial to pick selectees with the best experience or education

10  in relation to your facility" because (1) the selectee may not transfer for a period of two years, *see*

11  Bernardoni Decl., Ex. 6 (Lozito Witness Aff. at 90) (stating that the selectee's manager at the

12  previous facility decides when the selectee can be released within a two-year window), and (2)

13  once the selectee does arrive to Oakland Tower, he or she must go through a one- to two-year

14  training process "to reach the Certified Professional Controller (CPC) position or level," which "is

15  the level in which the employee can work all the positions at the facility on their own."

16  Bernardoni Decl., Ex. 6 (Lozito Witness Aff. at 74).  During the training period, "the selectee is

17  used in your facility staffing numbers," and "[e]ach facility has very limited staffing resources so

18  it is extremely important as a manager to pick candidates that you believe will train quickly and

19  successfully."  Bernardoni Decl., Ex. 6 (Lozito Witness Aff. at 74); *see also* Bernardoni Decl., Ex.

20  6 (Lozito Witness Aff. at 82) (making the same point).

21        Because Mr. Shannon initiated an EEO complaint against Ms. Lozito, the EEO

22  investigated and compiled information about Ms. Lozito's hiring history at Oakland Tower.  That

23  information included the following:

24        (1) Ms. Lozito made 10 selections during a two-year period (presumably, 2014-2015

25

26  [2] In her deposition, Ms. Lozito testified that, more than twenty years ago, she had to speak to her supervisor about the FAA rating form because she "couldn't understand how to use [the] form

27  when I wanted to bid a job."  Bennett Decl., Ex. B (Lozito Depo. at 39).

28  [3] Ms. Lozito herself did not complete college but she did obtain an associate's degree at Diablo Valley College.  *See* Bennett Decl., Ex. B (Lozito Depo. at 17-18).

1             which is when the relevant events took place).

2             (2) Three out of the 10 selections were for managers and the managers selected were

3                      ages 31, 37, and 54.

4             (3) Seven out of the 10 selections were made from ERR lists, and 63 people submitted

5                      ERR packages.  Of those 63 people, 4 – including Mr. Shannon – were age 40 or

6                      older (*i.e.*, about 6.3% of the pool were age 40 or over).  Ultimately, the 7

7                      selections that were made were all people between the ages of 30-37.  Nothing is

8                      known about the qualifications of the people who were age 40 or over, except for

9                      Mr. Shannon.

10 *See* Bennett Decl., Ex. D (ROI at 9-10).

11       As noted above, Mr. Shannon brings a disparate treatment claim.  In support of his

12 disparate treatment claims, Mr. Shannon cites to, *inter alia*, an affidavit from another Napa ATC,

13 Ron Winterton, who told the EEO investigator that he "believes [Mr. Shannon] was not selected

14 for a transfer or promotion because of his age.  Mr. Winterton named five employees under the

15 age of 40 that were selected from Napa over [Mr. Shannon] between 2013-2015."  Bennett Decl.,

16 Ex. D (ROI at 8); *see also* Bennett Decl., Ex. G (Winterton Aff. at 122, 124) (stating that "I know

17 that Oakland has selected 5 people that Shannon trained, and they are all under the age of 40," and

18 that "I do not have any evidence to support that Mr. Shane was not selected because he is over the

19 age of 40, but everyone else was under the age of 40").

20 D.      Selections from ERR Lists and Internal Vacancy List

21       It appears that the 7 ERR selections made by Ms. Lozito related to 3 different openings at

22 Oakland Tower.  Below are details about those selections.  The Court acknowledges that Mr.

23 Shannon's claim of disparate treatment is based on only 2 of those openings.  Mr. Shannon asserts,

24 however, that the third opening is still relevant since it is part of an alleged pattern/practice of Ms.

25 Lozito not selecting older candidates.

26       Also included below is information about a selection that Ms. Lozito made for an internal

27 vacancy.  Mr. Shannon is not claiming disparate treatment based on that internal vacancy but, as

28 above, contends that it is part of Ms. Lozito's alleged pattern/practice not to select older

United States District Court
Northern District of California

1    candidates.

2              1.        First ERR Opening (ERR 320)

3              Mr. Shannon **does** claim disparate treatment for not being selected for the first ERR

4    opening.

5              In early 2014, Human Resources prepared a list of eligible candidates for an opening at

6    Oakland Tower (ERR 320).  *See* Bernardoni Decl., Ex. 3 (Amended Merit Selection Certificate).

7    There were 15 people on the list, including Mr. Shannon.

8              Ms. Lozito selected Jayson Yabut.  *See* Bernardoni Decl., Ex. 3.  At that time, Mr. Yabut

9    "had a four-year Bachelor's degree in aeronautics from Embry-Riddle Aeronautical University."

10   Yabut Decl. ¶ 3.  He was an ATC specialist at Binghamton ATCT/TRACON, which is a Level 5

11   tower facility.  *See* Yabut Decl. ¶ 2; *see also* Bernardoni Decl., Ex. 8 (Rog Resp. at 14) (noting

12   that "[a]n up/down facility is where the controllers are responsible for the towered airspace and the

13   approach control radar responsibilities for inbound and outbound traffic"; that Mr. Yabut was at a

14   "Level 5 up/down radar facility"; and that, based on this experience, "Mr. Yabut [was] a good

15   candidate for OAK ATCT as OAK ATCT also had towered responsibilities and provided limited

16   approach responsibilities such as radar separation for arrivals and departures").

17             2.        Second ERR Opening (ERR 366)

18             Mr. Shannon does **not** claim disparate treatment for not being selected for the second ERR

19   opening.  (He was not on the list of eligible candidates).

20             In mid-2014, an ERR list was requested for an opening at Oakland Tower (ERR 366).

21   Several months later, Human Resources prepared an ERR list.  *See* Bernardoni Decl., Ex. 4 (Merit

22   Selection Certificate).  There were 22 people on the list.

23             Ms. Lozito ultimately selected four people off the list.  *See* Bernardoni Decl., Ex. 4.  Those

24   four people were as follows:

25             •    Jolyon Bishop.  At the time of selection, Mr. Bishop Mr. Bishop had a B.A. from

26                  the University of California.  He had worked at a Level 6 tower facility as well as a

27                  Level 5 tower facility.  *See* Bernardoni Decl., Ex. 11 (Rating of Air Traffic

28                  Experience for AT Movement).

United States District Court
Northern District of California

7

- Donte Harris.  At the time of selection, Mr. Harris had completed only a year and a half of college.  He had worked at a Level 11 in-route facility and a Level 6 tower facility.  *See* Bernardoni Decl., Ex. 12 (Rating of Air Traffic Experience for AT Movement).

- Christopher Padilla.  At the time of selection, Mr. Padilla had a B.S. from the University of California, Davis.  He had worked at a Level 11 in-route facility and at a Level 6 tower facility.  *See* Bernardoni Decl., Ex. 13 (Air Traffic Experience for CPC Positions).

- Andrew Yau.  At the time of selection, Mr. Yau had a Computer Engineering degree from the University of California, Davis.  He had worked at a Level 6 tower facility.  *See* Bernardoni Decl., Ex. 14 (Rating of Air Traffic Experience for AT Movement).

3.     Third ERR Opening (ERR 424)

Mr. Shannon **does** claim disparate treatment for not being selected for the third ERR opening.

In late 2014, Human Resources prepared an ERR list for an opening at Oakland Tower (ERR 424).  There were 22 people on the list, including Mr. Shannon.  In 2015, Ms. Lozito selected 2 people for the position: Shantel Brooks and Ross Del Sarto.  *See* Bernardoni Decl., Ex. 5 (Merit Selection Certificate).

a.     Ms. Brooks

Ms. Brooks had a Bachelor's degree from Spelman College.  *See* Bernardoni Decl., Ex. 16 (Rating of Air Traffic Experience for AT Movement); Bennett Decl., Ex. K (same).  She had worked at a Level 9 tower facility (San Francisco[4]) and at a Level 4 tower facility.  *See* Bernardoni Decl., Ex. 16; Bennett Decl., Ex. K.

During the EEO investigation, Ms. Lozito claimed that, while at the San Francisco Tower, Ms. Brooks became certified on both the Flight Data and Ground Control positions, but not at the

---

[4] San Francisco is currently a Level 10 facility.  *See* Reply at 4 n.2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Local Control position, which resulted in her not becoming a CPC at San Francisco Tower and

2    being placed at the lower level Napa Tower.  *See* Bernardoni Decl., Ex. 6 (Lozito Aff. at 79).  At

3    her deposition, Ms. Lozito admitted that, in fact, Ms. Brooks had not certified on Ground Control

4    at San Francisco.  Ms. Lozito claimed to have learned that fact the day before her deposition.  *See*

5    Bennett Decl., Ex. B (Lozito Depo. at 16-17).

6            Ultimately, Ms. Brooks certified fully at Napa Tower and thus became a CPC there.  *See*

7    Bernardoni Decl., Ex. 6 (Lozito Aff. at 82).  Mr. Shannon was one of Ms. Brooks's trainers while

8    she was at Napa Tower.  *See* Bennett Decl., Ex. A (Shannon Depo. at 74-75); *see also* Bennett

9    Decl., Ex. H (DiBernardo Aff. at 114).

10                      b.       Mr. Del Sarto

11           As for Mr. Del Sarto, at the time of selection, he had a B.A. in Political Science from San

12   Francisco State University.  *See* Bernardoni Decl., Ex. 15 (Rating of Air Traffic Experience for

13   AT Movement); Bennet Decl., Ex. M (same).  Also, he had worked at a Level 11 in-route facility

14   and a Level 6 tower facility (Palo Alto).  *See* Bernardoni Decl., Ex. 15; Bennet Decl., Ex. M.

15   According to Ms. Lozito,

16                      I am impressed with any candidate from [Palo Alto] as they usually
                       [are] very successful at higher level facilities.  PAO ATCT has one
17                      very small runway, incredible amounts of general aviation aircraft
                       and very compacted airspace.  To certify at PAO ATCT, the
18                      controller would have to possess excellent skills in sequencing
                       aircraft, separating aircraft, and multi-tasking.  A selectee from PAO
19                      would also have experience in airspace complexities, Class Bravo,
                       Charlie, and Delta airspace, Bay Area airspace configurations and
20                      NCT Radar Sectors.  These are very relatable and valuable skills to
                       OAK.
21

22   Bernardoni Decl., Ex. 6 (Lozito Aff. at 83).

23           4.       Internal Vacancy

24           Mr. Shannon does **not** claim disparate treatment for not being selected for the Internal

25   Vacancy.

26           In mid-2015, there was an Internal Vacancy at Oakland Tower (Internal Vacancy 41341).

27   Human Resources prepared a referral list.  *See* Bernardoni Decl., Ex. 17 (referral list).  There were

28   11 people on the list.

9

United States District Court
Northern District of California

1      Ms. Lozito ultimately selected Amanda Ascherl.  At the time of selection, Ms. Ascherl had

2   a Bachelor's degree in Economics from the University of Maryland and had worked at a Level 4

3   tower facility (Napa).  *See* Bernardoni Decl., Ex. 18 (Rating of Air Traffic Experience for AT

4   Movement); Bennett Decl., Ex. L (same).  Furthermore, she had a pilot's license.  According to

5   Ms. Lozito, "[a]n Air Traffic Controller with a pilot's license brings knowledge and relevant

6   experience in aircraft characteristics, flight charts, instrument approaches, weather dissemination,

7   and flight routes.  These are relevant skills and qualifications for OAK ATCT."  Bernardoni Decl.,

8   Ex. 6 (Lozito Aff. at 84).  It appears that, during the EEO investigation, Ms. Lozito told the

9   investor that she remembered Ms. Ascherl because "'she is young and six feet or taller.'"  Bennett

10  Decl., Ex. B (Lozito Depo. at 87-88).

11                                  **II.       DISCUSSION**

12  A.      Legal Standard

13      Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

14  [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

15  the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is

16  genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

17  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a

18  scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

19  reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

20  must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

21  are to be drawn in the nonmovant's favor.  See id. at 255.

22      Where a defendant moves for summary judgment based on a claim for which the plaintiff

23  bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

24  showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

25  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

26  B.      Legal Framework

27      Mr. Shannon has essentially brought a failure-to-promote claim (given that Oakland Tower

28  is a higher-level tower compared to Napa Tower, which impacts pay).

10

1    [A] failure-to-promote claim is a claim of disparate treatment under
2    the ADEA.  The ADEA makes it unlawful for an employer to
     discriminate "because of [an] individual's age."  29 U.S.C. §
3    623(a)(1).  The prohibition is "limited to individuals who are at least
     40 years of age."  29 U.S.C. § 631(a).  The ADEA applies to protect
4    federal employees and applicants for federal employment.  29
     U.S.C. § 633a(a).  To prevail on a claim for age discrimination
5    under the ADEA, a plaintiff must prove at trial that age was the
     "but-for" cause of the employer's adverse action.  *Gross*, 129 S. Ct.
6    at 2350 [a 2009 Supreme Court decision].  "Unlike Title VII, the
     ADEA's text does not provide that a plaintiff may establish
7    discrimination by showing that age was simply a motivating factor."
     *Id.* at 2349.

8    *Shelley v. Geren*, 666 F.3d 599, 606-07 (9th Cir. 2012).

9         Because direct evidence of discrimination is often unavailable, plaintiffs often "rely on the

10   burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as

11   a way of channeling inquiry into the available circumstantial evidence."  *Ballou v. McElvain*, 29

12   F.4th 413, 422 (U.S. 9th Cir. 2022).  "The *McDonnell Douglas* test is used on summary judgment,

13   not at trial."  *Shelley*, 666 F.3d at 607.

14   Under *McDonnell Douglas*, a plaintiff may make out a prima facie
     case of discrimination by demonstrating that "(1) she is a member of
15   a protected class; (2) she was qualified for her position; (3) she
     experienced an adverse employment action; and (4) similarly
16   situated individuals outside her protected class were treated more
     favorably."  *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1228 (9th Cir.
17   2021) (alterations adopted) (quoting *Fonseca v. Sysco Food Servs.
     of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004)) (applying
18   McDonnell Douglas in the Title VII context).  Once a plaintiff has
     established a prima facie case, the burden shifts to the defendant to
19   "show a legitimate, nondiscriminatory reason for the challenged
     actions."  *Id.*  If he is able to do so, the burden "returns to the
20   plaintiff, who must show that the proffered nondiscriminatory
     reason is pretextual."
21

22   *Ballou* v, 29 F.4th at 422.

23
     The plaintiff can prove pretext "(1) indirectly, by showing that the
24   employer's proffered explanation is 'unworthy of credence' because
     it is internally inconsistent or otherwise not believable, or (2)
25   directly, by showing that unlawful discrimination more likely
     motivated the employer."  All of the evidence – whether direct or
26   indirect – is to be considered cumulatively.

27   *Shelley*, 666 F.3d at 609.

28        In the instant case, the government does not dispute that Mr. Shannon has established a

United States District Court
Northern District of California

1    prima facie case for both of the job openings at Oakland Tower, *see* Reply at 12: (1) Mr. Shannon

2    was in his mid-40s at the time; (2) he was qualified for the positions (as indicated by the fact that

3    he was on the lists of eligible candidates); (3) he did not get the positions; and (4) people younger

4    than 40 were selected instead.  The government argues, however, that there were legitimate,

5    nondiscriminatory reasons as to why Mr. Shannon was not selected – namely, other people were

6    better qualified based on (a) their having worked a higher-level tower facility and (b) the

7    education level they achieved.  The government further argues that there is no genuine dispute that

8    Mr. Shannon cannot establish the legitimate, nondiscriminatory reasons for selecting persons other

9    than Mr. Shannon were pretextual.  The government maintains that, if anything, the selection

10   criteria at (a) and (b) would benefit older applicants rather than younger.  *See* Reply at 7 n.3.

11   C.    First ERR Opening

12          With respect to the first ERR opening, the government argues that there were legitimate,

13   nondiscriminatory reasons for Ms. Lozito to select Mr. Yabut.  Mr. Yabut had experience at a

14   Level 5 tower facility, and he had a four-year Bachelor's degree in aeronautics.  In contrast, Mr.

15   Shannon worked at a Level 4 tower facility and had completed some college coursework but did

16   not have a degree.  *See Wingate v. Gage Cty. Sch. Dist.*, 528 F.3d 1074, 1079-80 (8th Cir. 2008)

17   (stating that, where "an employer 'contends that the selected candidate was more qualified . . .

18   than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether

19   there is reason to disbelieve the employer's proffered reason for its employment decision'[;] [i]f

20   the comparison 'reveals that the plaintiff was only similarly qualified or not as qualified as the

21   selected candidate,' then no inference of age discrimination would arise").

22          In response, Mr. Shannon argues that there is a question of fact regarding pretext.  For

23   example, Mr. Shannon contends that Mr. Yabut was not in fact more qualified because Ms. Lozito

24   did not sufficiently credit Mr. Shannon's ATC experience in the military or his college

25   coursework at Solano (where he was majoring in mechanical engineering).  He also suggests

26   education level was not that significant a factor, pointing out that the FAA form gives only a few

27   more points to someone who has a degree as opposed to someone who has done some college

28   coursework only.  Mr. Shannon further asserts that Ms. Lozito failed to give him credit for his

12

United States District Court
Northern District of California

1  time at Oakland Center, which as a Level 11 in-route facility, and failed to take into account that

2  Napa Tower had been a Level 5 when he first started working there.  Finally, Mr. Shannon points

3  to his colleague Mr. Winterton's belief that there was age discrimination and the past hiring

4  history of Mr. Lozito (*i.e.*, she has a pattern/practice of not hiring people 40 years and older).

5  Mr. Shannon's position is not persuasive.  A number of his arguments (*e.g.*, that Ms.

6  Lozito did not adequately credit his military experience, his college coursework, and his time at a

7  high-level in-route facility) are problematic in view of Ninth Circuit case law holding that, "where

8  the plaintiff does not . . . attack the selection criteria as having a disparate impact on the protected

9  class, 'we will not second guess the selection criteria used by an employer.'"  *Coleman v. Quaker*

10  *Oats Co.*, 232 F.3d 1271, 1289 (9th Cir. 2000); *see also Cotton v. Alameda*, 812 F.2d 1245, 1249

11  (9th Cir. 1987) (stating that "[t]he question is not whether [plaintiff] in the abstract had better

12  qualifications than the other candidates" but rather "whether the other candidates are more

13  qualified with respect to the criteria that [defendant] actually employs"; "[i]t is irrelevant that

14  some other criterion . . . might more accurately indicate someone's law enforcement abilities"

15  because "[t]he ADEA does not make it unlawful for an employer to do a poor job of selecting

16  employees" and instead merely makes it unlawful to discriminate on the basis of age"); *cf. Lidge-*

17  *Myrtil v. Deere & Co.*, 49 F.3d 1308, 1312 (8th Cir. 1995) (noting that "[defendant] proffered a

18  legitimate, non-discriminatory reason for giving [someone else] the position" and "[w]e do not sit

19  to determine if this reason is based on sound principles of business judgment"[;] "[r]ather the

20  relevant inquiry is whether [defendant's] decision was based on race").  Mr. Shannon has not

21  shown the criteria he asserts Ms. Lozito failed to apply tended to have a differential impact on

22  grounds of age.  Moreover, as a factual matter, even when the evidence is viewed in his favor, Mr.

23  Shannon's experience at an in-route facility cannot be equated with experience at a tower facility,

24  and there is no indication that his experience as a Navy shore-based ATC is comparable to

25  experience at a FAA tower facility.

26  Mr. Shannon's remaining arguments are also problematic.  For example, he asserts that

27  Ms. Lozito should have given him more credit for his experience at Napa Tower because, even

28  though it was a Level 4 facility at the time, it had been a Level 5, including at the time when he

United States District Court
Northern District of California

1    started.  But notably, in his ERR package that he submitted, Mr. Shannon did not claim that Napa

2    Tower had been a Level 5.  *See* Bernardoni Decl., Ex. 7 (FAA form) (in column for "Level" of

3    facility, stating "EH").[5]  Nor is there any record evidence suggesting that Ms. Lozito otherwise

4    knew or should have known about Napa Tower's past history as a Level 5.  Finally, even if Ms.

5    Lozito did know that Napa Tower had been a Level 5 facility, Mr. Yabut's education level still

6    exceeded that of Mr. Shannon.

7           Mr. Shannon also suggests that Mr. Winterton's belief that there was age discrimination

8    also precludes summary judgment.  But Mr. Winterton's belief has little probative value absent

9    personal knowledge about the selection decision.  And in any event, Mr. Winterton's belief is

10   ultimately predicated on hiring history, which is addressed below.

11          For hiring history, Mr. Shannon contends that Ms. Lozito had a pattern/practice of not

12   hiring people age 40 and over.  He notes that, for the 7 ERR selections she made (covering 3

13   openings, including the 2 for which Mr. Shannon applied), none were forty years or older.  There

14   was a total of 63 people in consideration, and 4 were age 40 or older (*i.e.*, 6.3%).

15          As an initial matter, the Court takes note that, given the relatively small sample size, there

16   should not be a statistical inference of intentional discrimination.  In *Aragon v. Republic Silver*

17   *State Disposal*, 292 F.3d 654 (9th Cir. 2002), the Ninth Circuit noted as follows:

18              [T]he fact that three of the four casuals singled out for lay off that
                night were white could constitute *circumstantial* evidence of
19              discrimination demonstrating pretext.  Yet, because the sample size
                is so small, we make no *statistical* inference of intentional
20              discrimination.  In *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d
                1072 (9th Cir. 1986), to show pretext, an employee relied on the fact
21              that four of the five employees laid off (out of 28 total employees)
                were African American.  We recognized that while "statistics have a
22              place in disparate treatment cases, their utility 'depends on all of the
                surrounding facts and circumstances.'"  We declined to consider the
23              employee's statistical evidence because "'statistical evidence derived
                from an extremely small universe' . . . 'has little predictive value and
24              must be disregarded.'"  The problem with a small number, of
                course, is that slight changes in the data can drastically alter the
25              result.

26

27   _____

     [5] For the other ERR package that Mr. Shannon submitted, he also did not state that Napa Tower
28   had been a Level 5 at one point.  *See* Bernardoni Decl., Ex. 2 (FAA form) (in column for "Level"
     of facility, stating "EH").

1    *Id.* at 663 (emphasis added).  Here, of course, the pool is bigger – 63 people instead of, as in

2    *Sengupta*, 28 people.  Nevertheless, the pool in the instant case is not dramatically bigger than that

3    in *Sengupta*.  *See also Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) (stating that "[a]

4    sample involving 6 female applicants in a pool of 38 applicants is likely too small to produce

5    statistically significant results"; noting that, in *Contreras v. County of Los Angeles*, 656 F.2d 1267

6    (9th Cir. 1981), the court "discount[ed] [the] probative value of [a] statistical sample consisting of

7    57 test-takers, 17 of whom belonged in the plaintiffs' protected class"); *Prowse v. Mayorkas*, No.

8    21-00057 ACK-WRP, 2022 U.S. Dist. LEXIS 39348, at *25 (D. Haw. Mar. 7, 2022) (noting that,

9    "[i]n *Freyd*, where the Ninth Circuit found the plaintiff's statistical evidence sufficient to establish

10   a prima facie case of disparate impact, the proffered statistics covered a ten-year period, which

11   amounted to 'a data set that included 125 data points' and a '99 percent degree of confidence'").

12          *Aragon* still leaves open the possibility that the hiring history of Ms. Lozito could be

13   circumstantial evidence of intentional discrimination/pretext.  But "[t]o establish a prima facie

14   case based solely on statistics, let alone raise a triable issue of fact regarding pretext, the statistics

15   'must show a stark pattern of discrimination unexplainable on grounds other than age.'"  *Coleman*,

16   232 F.3d 1271, 1283 (9th Cir. 2000).  Here, it cannot be said that there is a stark pattern of

17   discrimination unexplainable on grounds other than age given that the pool of 63 people were

18   primarily made up of people younger than age 40.  *See* Reply at 13 ("[O]nly 6.3% of the 63 ERR

19   candidates during this two-year period were over the age of 40, including Plaintiff.").  In other

20   words, given the small number of people age 40 and over in the pool (a total of 4 people), it is not

21   surprising that the people hired were not from that group.  *See Stout*, 276 F.3d at 1123 ("Female

22   applicants comprised 13.3 percent (2 of 15) of all those interviewed and 15.8 percent (6 of 38) of

23   the original applicant pool.  The percentage of interviewees who are female is nearly proportional

24   to the percentage of applicants who are female.  The 2.5 percent difference is not a substantial or

25   significant statistical disparity").

26          Furthermore, Mr. Shannon does not provide any evidence about the qualifications of the

27   other 3 people who were age 40 or over (Mr. Ruiz, Mr. Heskett, and Mr. Garcia) and who were

28   not selected.  Without some information about the qualifications of those 40 years and older, there

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1   could be many reasons for nonselection other than age.  *See Aragon*, 292 F.3d at 663 ("[T]he

2   statistics must show a stark pattern of discrimination unexplainable on grounds other than [race].

3   Aragon's statistical evidence presents no stark pattern, nor does it account for possible

4   nondiscriminatory variables, such as job performance.  Thus, we find Aragon's statistics

5   insufficient to raise an inference of racial discrimination.") (internal quotation marks omitted); *see*

6   *also Pottenger v. Potlatch Corp.*, 329 F.3d 740, 748 (9th Cir. 2003) (noting that plaintiff's

7   "statistical analysis of the RIF [reduction in force] takes into account only two variables – the

8   employee's age at the time of the RIF and whether the employee was terminated[;] [t]he numbers

9   show a statistically significant relationship between these two variables, but this court and others

10  have treated skeptically statistics that fail to account for other relevant variables").  Indeed, the

11  Court takes note that, for Mr. Heskett at least, it appears that he was only recently certified; the

12  lack of certification would have been a legitimate, nondiscriminatory reason not to select him.  *Cf.*

13  *Finley v. Cty. of Martin*, No. C-07-5922 EMC, 2009 U.S. Dist. LEXIS 119863, at *38 (N.D. Cal.

14  Dec. 23, 2009) ("Whether pattern or practice evidence is sufficient to defeat summary judgment

15  depends on the quality of the evidence.  It must be 'sufficiently probative' to point to bias.").

16          Finally, it is worth noting that the record indicates Ms. Lozito hired 3 managers during the

17  relevant period (hires which did not involve Mr. Shannon), and one of those hires was over the age

18  of 40.  The ages of the managers selected were 31, 37, and 54.  *See* Bennett Decl., Ex. D (ROI at

19  9).

20          Accordingly, the Court concludes that there is no genuine dispute of material fact that Ms.

21  Lozito had legitimate, nondiscriminatory reason for selecting Mr. Yabut – his education and

22  experience at a higher-level tower facility; Mr. Shannon has failed to carry his burden of

23  demonstrating that the asserted reason was pretextual.  The Court therefore grants the government

24  summary judgment on the first ERR opening.[6]

25

---

26  [6] At the hearing, Mr. Shannon suggested that Ms. Lozito did not actually look for education and
    experience or else she would not have hired Mr. Harris for the second ERR opening (Mr. Harris
27  had only completed a year and a half of college) or Ms. Ascherl for the internal vacancy (Ms.
    Ascherl had only worked at Napa Tower, a Level 4 facility).  The problem for Mr. Shannon is that
28  he has provided no information about the qualifications of the persons age 40 or older who applied
    for the positions for which Mr. Harris and Ms. Ascherl were selected.  There is no basis for

United States District Court
Northern District of California

D.      Third ERR Opening

With respect to the third ERR opening, the government similarly argues that there were

legitimate, nondiscriminatory reasons for Ms. Lozito to select Ms. Brooks and Mr. Del Sarto.  Ms.

Brooks had a Bachelor's degree from Spelman College and had worked at San Francisco Tower at

one point (Level 9) – albeit as a developmental only, not a CPC – before working at Napa Tower

(Level 4).  Mr. Del Sarto had a B.A. in Political Science from San Francisco State University and

had worked at a Level 6 tower facility (Palo Alto).

The analysis above applies equally to the extent Ms. Lozito selected Mr. Del Sarto instead

of Mr. Shannon.  Mr. Del Sarto worked at a higher-level tower facility and had a four-year degree.

However, for Ms. Brooks, the Court recognizes that Mr. Shannon has additional arguments

related to pretext: in particular, (1) Ms. Lozito "lied" about Ms. Brooks's experience at San

Francisco Tower (she had certified for Flight Data only, but not Ground Control), and (2) Ms.

Lozito called Ms. Brooks "poised."  Neither of these arguments is persuasive for the reasons

discussed below.[7]

Regarding (1), it is true that, during the EEO investigation in 2016, Ms. Lozito claimed

that, while at the San Francisco Tower, Ms. Brooks became certified on both the Flight Data and

Ground Control positions.  In fact, Ms. Brooks had not certified on Ground Control.  Ms. Lozito

admitted this at her deposition, asserting that she learned that fact only the day before her

deposition.  Mr. Shannon contends that Ms. Lozito lied about Ms. Brooks's experience; the

government asserts that Ms. Lozito simply made an honest mistake.  *See Villiarimo v. Aloha*

*Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("In judging whether [defendant's] proffered

justifications were 'false,' it is not important whether they were objectively false . . . . Rather,

courts only require that an employer honestly believed its reason for its actions, even if its reason

is foolish or trivial or even baseless.  As the district court correctly observed, [plaintiff] presented

no evidence that [defendant] did not honestly believe its proffered reasons.").

inferring disparate treatment in regard thereto.

[7] At the hearing, Mr. Shannon admitted that his point total on the FAA rating form was not
significantly different from Ms. Brooks's point total.

United States District Court
Northern District of California

1    Although the parties do have a dispute here, the question at this juncture is whether there is

2    *evidence* to create a genuine dispute about whether Ms. Lozito lied.  In his papers, Mr. Shannon

3    has not pointed to any specific evidence to support the claim that Ms. Lozito lied.  Based on the

4    Court's independent review of the record, the only evidence that suggests Ms. Lozito might have

5    lied is that she seems to have been on the training review board at SFO while Ms. Brooks was

6    there.  *See* Bennett Decl., Ex. B (Lozito Depo. at 71).[8]  If she was on the training review board at

7    SFO while Ms. Brooks was there, then arguably she would have been in a position to know

8    whether Ms. Brooks had actually certified on Ground Control.  The problem for Mr. Shannon is

9    that it appears Ms. Brooks was at SFO from February 2009 to October 2010.  *See* Bennett Decl.,

10   Ex. K (Rating of Air Traffic Experience for AT Movement).  Ms. Lozito did not hire for the

11   position that Ms. Brooks filled until 2015 – *i.e.*, some five years later.  Given the passage of time,

12   it is not a reasonable inference that Ms. Lozito remembered in 2015 that Ms. Brooks had not

13   certified for Ground Control some five years earlier and chose to deliberately lie about Ms.

14   Brooks's qualifications.  This is especially true given that, even if Ms. Brooks had not certified in

15   Ground Control, she had still certified on Flight Data and had worked at a high-level tower

16   facility.  *See also* Supp. Decl., Ex. 27 (Lozito Depo. at 127) ("I felt she would do very well at

17   Oakland tower.  Anybody who shows that kind of grace under pressure, I felt would do very well.

18   She learned massive amounts of information in a short period of time.  So even though she didn't

19   make it at San Francisco tower, she mastered flight data clearance delivery, which was a very

20   complex, complex position, and she mastered that.  She came close on ground.  I thought she'd

21   actually certify, but ground at San Francisco tower is a beast and she – she made a good effort

22   because she was always poised under a great deal of stress, which is something we look for in

23   traffic; people who don't fall apart.").

24          As for (2), Mr. Shannon argues that one can infer pretext based on the fact that Ms. Lozito

25

26   _____

27   [8] At her deposition, Ms. Lozito was asked: "Do you know while you were on the training review
     board at SFO while Ms. Brooks was there whether she certified on local control?"  Bennett Decl.,
     Ex. B (Lozito Depo. at 71).  Ms. Lozito answered: "No.  If she didn't certify in ground, then it
28   must have been ground I was there for.  I made a mistake."  Bennett Decl., Ex. B (Lozito Depo. at
     71).

called Ms. Brooks "poised," which he contends is a code word for "young." Opp'n at 12. This

argument lacks merit. As the government points out, Mr. Shannon provides no support for his

position that "poised" is some kind of code word or is related to age-based considerations.

Furthermore,

> when viewed in the context that Ms. Lozito used that word, it makes
> perfect linguistic sense. Ms. Lozito had seen Ms. Brooks in action
> at a busy, complex Level 9 tower facility and observed that Ms.
> Brooks demonstrated "grace under pressure," she was "always
> poised under a great deal of stress," and she did not "fall apart."

Reply at 14.

In short, even viewing the record facts in his favor, Mr. Shannon has failed to carry his

burden of establishing pretext. Accordingly, here, as above, the Court also concludes that there is

no genuine dispute of material fact regarding pretext and thus grants the government summary

judgment on the third ERR opening as well.[9]

### III.   CONCLUSION

Because there is no genuine dispute of material fact on pretext, for either ERR opening at

issue, the Court grants the government's motion for summary judgment.

This order disposes of Docket No. 78. The Clerk of the Court is instructed to enter a final

judgment in accordance with this opinion and close the file in the case.

**IT IS SO ORDERED**.

Dated: June 14, 2022

_____
EDWARD M. CHEN
United States District Judge

---

[9] Because the Court is granting summary judgment on pretext, it need not address the government's remaining arguments (although it notes that the arguments were not contested by Mr. Shannon) – to wit, that (1) much of the damages sought by Mr. Shannon are barred – *e.g.*, emotional distress, reputational harm, physical injury, business opportunities, etc. and (2) Mr. Shannon does not have a right to a jury trial because the government is the defendant. *See* Mot. at 23-24.

United States District Court
Northern District of California